## LOYD *v.* THE STATE.

1. The court did not err in permitting a witness, who was a neighbor of the prosecutrix, to testify that her children of tender age came through the darkness to his house. The conduct of the children, under the circumstances testified to by the prosecutrix in the case, was a material fact for the consideration of the jury. Likewise the evidence as to the conduct of the prosecutrix when she came to the house where these children were, immediately after the commission of the crime, which tended to show her mental condition.

2. The statement of the defendant tending to show that the prosecutrix was a woman of immoral character and that she had been guilty of lewd acts, it was permissible for the State to introduce evidence tending to show her general good character.

3. The court, having charged the jury that to constitute the crime of rape carnal knowledge must be accomplished by the use of force, did not err in instructing the jury as to other elements of the crime of rape by his failure to repeat the instructions as to the necessity of the existence of the element of force in the commission of the crime.

4. The charge of the court on the subject of force as an essential element of the crime of rape is not open to the criticism that it is either misleading or argumentative, or that it qualifies that part of the statute relating to that element of the crime.

5. The evidence authorized the charge upon the subject of violence and force used by the defendant.

6. The charge upon the subject of the necessity of corroboration of the testimony of the alleged victim of the assault contains nothing of which the defendant can complain.

7. The court was authorized, under the evidence, to instruct the jury that in passing upon the question of the defendant's guilt they might consider whether the prosecutrix was of good fame or not, and whether after the alleged act she presently discovered the alleged offense, showed circumstances or signs of injury, and similar facts and circumstances.

8. It is not ground for reversing the judgment of the court denying a new trial, that the court reduced to writing the different forms of a verdict in a case like this, there being no complaint that the court omitted to give a written form for a verdict favorable to the defendant.

9. Where the court omitted in his charge to the jury to instruct them upon the subject of the defendant's statement, but recalled the jury before they made their verdict and instructed them upon that subject, the omission to charge in the first instance will not require the grant of a new trial.

10. After the jury returned a verdict of guilty and recommended that the defendant be punished by confinement in the penitentiary for one year, the court instructed them that in order to render their verdict proper as to form they should fix a minimum and a maximum sentence, and that if they wished to fix it just one year and no longer, as their verdict seemed to express, it would be all right to write into the verdict "not less than one year nor more than one year." This the jury did. *Held,* as no less a sentence than one year could have been imposed, under the law, that the defendant was not injured by the instruction complained of.

No. 2018. DECEMBER 18, 1920. REHEARING DENIED JANUARY 14, 1921.

Indictment for rape. Before Judge Graham. Bleckley superior court. March 20, 1920.

*John R. Cooper, W. O. Cooper, Jr.,* and *C. A. Weddington,* for plaintiff in error.

*R. A. Denny, attorney-general, W. A. Wooten, solicitor-general,* and *Graham Wright,* contra.

BECK, P. J. Tom Loyd was tried under an indictment charging him with the offense of rape, alleged to have been committed upon Lilla Mathis. The jury returned a verdict of guilty, and the defendant's motion for a new trial was overruled.

1. Error is assigned upon the ruling of the court by which one George Griffin was permitted to testify, over the objection of defendant's counsel, that he saw certain children of Lilla Mathis, the prosecutrix, on the night of the commission of the alleged crime. The ground of the objection to the testimony was that it was not relevant, that it was hearsay, and that what the woman's children did in no way corroborated her testimony. The evidence was not irrelevant, but was relevant, material, and admissible. The prosecutrix had testified that the accused and

his brother came to her house just at dark. She testified to acts of violence and threats upon the part of the men. She had six children, the oldest 13 years of age. Her children were living in the house with her; her husband was dead. If she was forcibly seized, as she testified, there was no one to protect her children; and these young children fled in the darkness, some going to one neighbor's house and others to another. This was a material fact tending to corroborate the recital given by the witness of the attack made upon her. It was to be considered by the jury along with other facts and circumstances of the case. It was for the jury to determine whether the mother had sent the children away from her home, or whether they fled when the mother was attacked. Nor did the court err in admitting, over objection, the testimony of the same witness to the effect that when the prosecutrix reached his house that night she "kind of slided in the door like" and seized him about the neck. This conduct upon the part of the prosecutrix was admissible as tending to throw light upon her physical and mental condition at the time.

2. A witness for the State was permitted to testify, over objection, that the general moral character of the prosecutrix in the community was good. This was objected to upon the ground that the State could not introduce evidence of the prosecutrix's character when it had not been attacked. A sufficient reply to this objection is that the prosecutrix's good character had been attacked by defendant. In his statement the defendant recited to the jury the circumstances under which the prosecutrix moved to his place, and stated that on one occasion, although she had gotten very little money from him, she came to his store and made purchases of a considerable amount, and when he protested she replied that she had plenty of money, and pulled out a twenty-dollar bill. Further in his statement the defendant said: "Thornton O'Neal and Scarboro Mann [the former a negro, and possibly the latter also] come to my house and bought some stuff out of the commissary. They left my house and went towards old Lilla's [the prosecutrix]. I did not pay any attention to them; it was Christmas, and I knew negroes were going to frolic and have a big time Christmas. Christmas morning old Thornton come back to my house about half drunk,

laughing and telling me; he said, 'Mr. Tom, old Lilla got drunk as hell last night.' I said, 'Who made her drunk?' He said, 'I made her drunk, and I took her in the house and tended to her twice, and she got so crazy about it she got up and went home with me.'" The tendency of this statement was to show that the woman was of immoral character, a prostitute, and given to drinking intoxicating liquor to excess. The court properly allowed her to introduce testimony to repel that statement of the defendant. From the decision in the case of *Crawley* v. *State,* 137 *Ga.* 777 (74 S. E. 537), it appears that the accused in his statement had declared that the deceased was a dangerous man, that he apprehended the latter would shoot him at the first opportunity, as he had threatened to do it many times to many people, and that he had shot and killed the defendant's brother, and had hounded him around and made various threats against defendant; and he stated other instances showing that the decedent was a man of violent character and relentless in determination to take advantage of a fitting opportunity for the purpose of slaying the accused. This court held in that case that the court properly permitted counsel for the State to introduce evidence tending to develop before the jury the question as to whether the slain man was one of peaceable or of violent disposition and character. It was also said in that case: "It has been held that the defendant can put his own character in issue by his statement alone. (*Jackson* v. *State,* 76 *Ga.* 552); and if he can put his own character in issue merely by his statement, it would seem that he could put that of the slain man in issue." And so we say here, that the accused could and did, by his statement, put the character of the prosecutrix in issue.

3. Where the court in his charge to the jury instructed them "That to constitute the crime of rape carnal knowledge must be accomplished by the use of force," it was not error for the court to charge, in further instructing the jury as to the elements of the crime of rape, that "there must be carnal knowledge of the female, that is, the organ of the male must penetrate the organ of the female. Slight penetration, however, is sufficient. The mere entering of the vulva of the female organ by the penis of the male would be sufficient penetration." This charge was not

error, although he did not repeat in this connection that the penetration should have been accomplished by force.

4. Error is assigned upon the following charge of the court: "Secondly, to constitute the crime of rape, carnal knowledge must be accomplished by the use of force. The mere amount of force ordinarily involved in mere sexual intercourse would not be sufficient to constitute the crime of rape. It must be shown that the amount of force used was such as might reasonably be supposed to be sufficient to overcome the strength of the particular female alleged to have been raped. If the alleged sexual intercourse was not accomplished by the use of such force as might be reasonably supposed to be sufficient under the circumstances then surrounding the parties, to overcome the strength of the female alleged to have been raped, the alleged offense would not be the offense of rape." Counsel for plaintiff in error contend that this charge was prejudicial and argumentative, and calculated to mislead the jury; that the jury, before they could convict the defendant of the offense of rape, had to believe beyond a reasonable doubt that the defendant had carnal knowledge of the female forcibly and against her will, and that the use of the expression "such as might reasonably be supposed to be sufficient to overcome the strength of the particular female alleged to have been raped," was a qualification of the idea of force which is an element of the crime of rape, and the qualification is unauthorized by the statute. The charge is not argumentative, and the expression "reasonably sufficient" could hardly have had the effect of misleading the jury or qualifying the idea of force necessarily existent in the crime of rape. Or, if it tended to have this effect, that was corrected in another part of the charge, which is also set forth in another ground of the motion, and which is as follows: "Thirdly, it must be shown that the alleged carnal knowledge of the female was accomplished against her will. It must not only appear that she did not expressly consent to the alleged intercourse, but it should appear that she resisted the alleged act of sexual intercourse in every possible manner, under the circumstances, considering the age, intelligence, condition, and strength of the parties, and the place and surroundings of the alleged tragedy, or that resistance was prevented by violence, or overcome by fear. If the alleged act of

sexual intercourse was consented to by the alleged female at any time before it was finally accomplished, the alleged act would not amount to the crime of rape."

5. The charge contained in the excerpt last set forth above is also excepted to upon the ground that there was no evidence to authorize the charge; that there was no evidence that the woman resisted; that the record shows that she did not resist, that she made no outcry, but practically consented to the intercourse; that there is no evidence that the defendant used violence to carry out his purpose. The unequivocal testimony of the prosecutrix answers this criticism upon the charge. She said, in part: "I was at my house that night [the night upon which the alleged crime was committed]. My children were there with me. Nobody else till Mr. Tom Loyd and his brother come down there. They come at first dark. . . He said if I would milk the cows I could have the milk, and I went up there and milked the cows. He was right out there when I milked them. I went back home, and Mr. Tom and his brother Joe came to my house. I had just stepped out on the porch to get some wood. My girl was cooking, and I went out to get the wood and she ran out there too. She stepped in the house when Mr. Tom Loyd walked up and caught hold of me; he caught hold of my arm right along here [indicating]. When he caught hold of my arm I said, 'Mr. Tom Loyd, I don't do nothing like this.' He said, 'Yes, but you are going to do it to-night though,' and he took me and was carrying me off. . . Mr. Joe Loyd had hold of my arm, talking about beating me; when I went out of the yard both of them had hold of my arm this way [indicating]. I could not do anything; if I had known they were coming I would have run. They carried me about 75 yards down in a little bottom in the woods from my house. I was standing up there wringing my hands that way [indicating]. I was scared and was crying. Mr. Tom Loyd said, 'There is no use of your crying; you might just as well come on, as I am going to have some of that.' He took and laid me down just like you take your coat there. I first held my feet together and he was talking about knocking me in the head. . . I did not fight him off when he did that, because I was scared. He said he would knock me in the head with his pistol. I don't know where Mr. Joe Loyd was at that time; he had stepped off somewhere. I let him

deal with me there because I could not help myself. He had the advantage of me. I knew he was a man and he was talking about knocking me in the head with his pistol. I did not want him to kill me, and me with my children." The witness then told of being carried to the house and the further outrage. If there are expressions in her testimony tending to show an absence of resistance and of consent, that was subject for comment and argument to the jury. The evidence in the record just quoted is sufficient to show that the charge under consideration was not unauthorized.

6. On the subject of the necessity of corroboration of the testimony of the prosecutrix, the court charged the jury as follows: "It is a general rule of law that a person should not be convicted of rape on the testimony of the alleged victim alone, unless there are circumstances proven which tend to corroborate her testimony to the satisfaction of the jury; and the degree of credit to be given her testimony would depend more or less upon the concurrence of such circumstances with her testimony." This charge, if erroneous at all, was not hurtful to the defendant.

7. The court also charged, that, " In determining the credibility of the female alleged to have been ravished, the jury may consider all the facts and circumstances of the case, her conduct at and subsequent to the alleged offense. The jury may consider whether she is of good fame or bad repute, whether after the alleged act she presently discovered the alleged offense, showed circumstances or signs of injury, or whether she concealed the alleged injury for any considerable length of time after she had an opportunity to complain, and all such similar acts and circumstances." This is excepted to on the ground that it is misleading and unauthorized by the evidence in the case. And here again we disagree with counsel for the plaintiff in error. Sufficient evidence has already been set forth to show the circumstances under which the crime charged was committed. It appears from the evidence that the woman's little children fled in the darkness from her house. One of her neighbors to whose house four of them had gone testified as follows: " On last Christmas eve night [the night of the alleged crime] I lived about three quarters of a mile from the place on Tom Loyd's farm where Lilla Mathis lived. On that night I was at home, sitting down with

my wife and children.  I know the children of Lilla Mathis; they came to my house that night, that is, four of them came there; the oldest girl was there; they come to my house about eight o'clock or half past eight.  Thornton and Scarboro come there with those children.  I saw Lilla Mathis that night, she come to my house somewhere between twelve and eleven o'clock, as near as I can get at it.  I did not have a time piece, I am just guessing at the time.  Lilla kind of slided in the room and grabbed me around the neck; she was crying, and she grabbed me around the neck, and she fell down on her knees on the floor; then she jumped up and grabbed me and fell down on her knees on the floor and said, ' Oh, my heart, my heart, my heart hurts me so bad I don't know what to do.'  After so long a time they got Lilla pacified, and she took her children and went out of the door and went to hunt the other children.  That is all I know about her that night.  Lilla was not drunk when she come there.  I never smelled any liquor.  She caught me around the neck so she could pull up; she could not stand up.  Lilla did not hug me then; she caught me around the neck so she could stand up."  Another witness testified: " On last Christmas eve night I lived about a mile, I reckon, from where George Griffin lived.  I know the children of Lilla Mathis, and I saw them that night.  I first saw the two boys; they came to my house about eight o'clock I reckon.  I also saw the other children of Lilla. Mathis that night; they came to my house about one o'clock with their mother.  When Lilla Mathis got to my house she came in the house and fell in the floor crying, and she said she had been assaulted by some men that night."  Evidence as to the woman's character has already been referred to and its admissibility ruled upon.

8-10.  No elaboration of the rulings made in headnotes 8, 9, and 10 is necessary.

*Judgment affirmed.    All the Justices concur.*